IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-03303-PAB-NRN

AMBER STROUGH, a citizen of Colorado, individually, as mother of Macayla Razes, as next friend of R.S., and as Personal Representative of Macayla Razes, deceased,
R.S., a citizen of Nebraska and a minor, by and through his grandmother and next friend, Amber Strough, and
MADISON STROUGH, a citizen of Colorado,

Plaintiffs,

v.

GENERAL MOTORS LLC, a Delaware limited liability company,
TRW VEHICLE SAFETY SYSTEMS INC., a Delaware corporation,

Defendants.

## ORDER ON
## PLAINTIFF'S MOTION IN SUPPORT OF REVISING
## PROTECTIVE ORDER (DKT. #57)

**Entered by Magistrate Judge N. Reid Neureiter**

This matter comes before the Court on Plaintiff's Motion in Support of Revising the Protective Order. (Dkt. #57.)

## BACKGROUND

This is a product liability lawsuit brought against an automobile manufacturer (General Motors LLC – "GM") and the manufacturer of a seatbelt system (TRW Vehicle Safety Systems Inc. – "TRW"), arising from a single car roll-over accident where Macayla Razes was ejected from a 2004 Chevy Impala and died. Plaintiff appears to be searching for documents and other evidence to support multiple, alternative, theories of liability.

First, Plaintiff claims that the 2004 Impala was defectively designed because it was not equipped with Electronic Stability Control ("ESC"), a feature which improves a vehicle's stability by detecting and reducing loss of traction by automatically applying the brakes to help "steer" a vehicle when ESC detects a loss of steering control. GM's ESC system was first introduced in select models in 1996-97. The National Highway Traffic Safety Administration required all new passenger vehicles sold in the US to be equipped with ESC as of the 2012 model year. Plaintiff's theory of defective design is that this proven safety-enhancing technology was available by the 2004 model year, and the failure to install it made the vehicle unreasonably dangerous and caused the accident.

Next, Plaintiff claims that the Impala's seatbelt system, manufactured and designed by TRW, failed or unlatched during the rollover, allowing her to be ejected. Finally, Plaintiff alleges that the Impala lacked overall rollover crashworthiness because it was not equipped with side-window or rear-window glass that was sufficient to withstand foreseeable crash forces sustained during a rollover and would have prevented Ms. Razes from being ejected.

The Court entered a protective order in this case on April 29, 2019 ("Protective Order"). (Dkt. #52.) The Protective Order followed the suggestion of Defendants in that it did not contain a so-called "sharing" provision which would allow Plaintiff's counsel to share the information obtained in discovery with "similarly situated litigants"—meaning lawyers in other lawsuits around the country involving similar issues against these same defendants.

However, Plaintiff felt she had not had an adequate opportunity to brief and argue for the inclusion of a sharing provision prior to the Court's entry of the Protective Order. Therefore, the Court allowed briefing on the subject. *See* May 15, 2019 Courtroom Minutes (Dkt. #56). On May 22, 2019, Plaintiff filed her brief in the form of a Motion/Brief in Support of Revising the Protective Order. (Dkt. #57.) Defendants filed a joint Response on May 29, 2019. (Dkt. #61.) The Court has reviewed the briefs and relevant cited authorities. Plaintiff's motion to modify or revise the Protective Order to include a "sharing" provision is **DENIED**.

## ANALYSIS

Plaintiff begins her brief by asserting that the "real reason" GM requests a protective order without a sharing provision is "to prevent other injured customers from obtaining access to important safety documents and to keep secret evidence of its negligence and misconduct." (Dkt. #57 at 1.) This is unnecessary, unsupported hyperbole and including such a statement in the introduction to a legal brief is counterproductive.

Plaintiff also argues that GM is not legally entitled to what Plaintiff calls a "blanket secrecy order" and that the fruits of pretrial discovery are, absent a court order to the contrary, "presumptively public." Plaintiff cites *Nixon v. Warner*, 435 U.S. 589 (1978), for the proposition that "[a]ccess to case records and files should be denied only when such access has become a vehicle for an improper purpose." (Dkt. #57 at 2.) Plaintiff also cites a case out of the Northern District of Georgia, *Parsons v. General Motors Corp.*, 85 F.R.D. 724 (N.D. Ga. 1980), for the proposition that "[c]ourts have long rejected blanket secrecy orders based on GM's claim that it needs to be protected from

competitors." And indeed, the *Parsons* case begins its own analysis by stating that the "general rule is that discovery and trial in the federal court are on open records available to the public." 85 F.R.D. at 726.

But the *Parsons* case is outdated and Plaintiff is mistaken. There is a strong presumption in favor of public access to documents and materials *filed in court and used in public court proceedings*. However, materials produced to an adverse party via the discovery process are treated differently from materials submitted to a court for adjudicative purposes or introduced into evidence during trial. As the Supreme Court explained in *Seattle Times Co. v. Rheinhardt*, 467 U.S. 20 (1984), judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in other contexts. The Rules authorizing pre-trial discovery are a matter of legislative grace. A litigant has no First Amendment right of access to information made available only through discovery for purposes of trying his suit. And restraints placed on discovered information are not a restriction on a traditionally public source of information. *Seattle Times*, 467 U.S. at 32-34.

The Court's objective is to get this case ready for trial promptly. Delays in discovery while the parties fight about whether documents can or cannot be shared with other lawyers who may seek to bring other cases in the future do not further the objective of getting this case ready for trial. It may actually cause delay in the production of documents as Defendants act more deliberately in deciding whether to produce or object to discovery, concerned that any material produced in discovery will be shared widely among the Plaintiffs' Bar across the country for no verifiable legitimate purpose.

As Judge Boland once said, citing *Seattle Times*, "Civil discovery is a device to allow parties to obtain information for the purpose of preparing and trying a lawsuit. Consequently, and contrary to plaintiff's argument, a party has no right to make unrestricted disclosure of the information obtained through discovery." *Guillard v. Boulder Valley Sch. Dist.*, 196 F.R.D. 382, 387 (D. Colo. 2000).

There are also fairness concerns associated with the kind of unfettered sharing provision Plaintiff seeks here. Documents produced in this case are likely to be vetted by counsel, and any Rule 30(b)(6) witness designated to speak in deposition for the corporation on issues germane to this lawsuit can be prepared fairly in advance to address documents (sometimes going back decades) produced in this case in response to specific discovery requests. If documents produced in this case are to be shared with as yet unidentified lawyers in as yet unidentified (or unfiled) cases, Defendants and their counsel in those future cases will not necessarily be cognizant of what has or has not been produced and adequate (and fair) preparation will be impossible in those cases.

This concern is particularly relevant for cases that span decades of technological development and where the specific personnel who made engineering or budget decisions reflected in the company documents are not currently available. Defendants, in their opposition, submitted evidence of just such a situation in a case arising out of the Circuit Court of Cook County Illinois, *Hall v. General Motors et al.*, where a corporate representative witness was confronted with what was alleged to be a General Motors document, lacking a Bates number, and neither GM's counsel nor the designated witness were aware of the document, which was actually a protected document that had been produced in another case. Plaintiff's counsel's uninformative

5

response at the deposition to questions about the origin of the document included the following: "I mean, it came from General Motors, obviously. I mean, it's a General Motors document. It's been around forever." (*See* Dkt. #61-2 at 4.)

I therefore agree with Defendants' position that an unfettered sharing provision is in fact an improper attempt to provide a strategic discovery benefit to counsel and litigants *in future cases* against the Defendants and has no bearing on discovery *in this case*. It is well-settled that discovery in one matter is not intended to afford a party an opportunity to seek information for an unasserted claim, or a yet-to-be filed case. *See e.g., Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through [materials] for evidence of some unknown wrongdoing). Nor is it intended to afford any party documents to be used outside the instant litigation. *See Seattle Times*, 467 U.S. at 34 (observing that liberal discovery is provided for the sole purpose of assisting and preparing for the preparation and trial, or the settlement, of litigated disputes).

Plaintiff also argues that because the vehicle in question was a 2004 model, there are no protectable trade secrets or confidential information that would merit protection in this case, given that any technology embodied in the car would likely be outdated by this point. But TRW has submitted an affidavit by its Senior Manager of Legal and Regulatory Compliance. (*See* Dkt. #61-1.) The affidavit explains that the there are numerous domestic and foreign component part suppliers that manufacture occupant restraint products such as seat belt assemblies. It is a highly competitive business and competitors are "always seeking to gain an advantage, be it better lead time for the introduction of new product or an understanding of the competition's

methods, thinking, goals, performance, or strategy." (*Id.* at ¶ 4.) Defendants make a persuasive argument that, given the breadth of Plaintiff's discovery requests, the disclosure of the information requested would severely and unfairly reduce TRW's competitive advantage in the market. The same could be said of the breadth of discovery directed towards GM. For example, Plaintiff seeks "all documents reflecting dynamic testing, crash testing, or sled testing on any GM vehicle in which the seat belt buckle failed, released, unlatched, or otherwise malfunctioned . . ." The documents reflecting such testing, even if years old, could prove useful to GM's competitors to see how GM engages in and analyzes crash-testing data.

Rule 26(c) of the Federal Rules of Civil Procedure provides that a court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). The party seeking a protective order bears the burden of establishing its necessity, *Centurion Indus., Inc. v. Warren Steurer & Assoc.*, 665 F.2d 323, 325 (10th Cir. 1981), but the entry of a protective order is left to the sound discretion of the court. *See Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008). Based on the evidence presented, I find that the entry of the Protective Order in this case was appropriate under the circumstances.

In addition, the fact that the Protective Order (Dkt. #52), as entered, does not contain a sharing provision does not mean that Defendants' produced documents will necessarily be protected forever from public view. The Protective Order provides a mechanism for the production of documents that the Defendants believe should be protected from public dissemination. But, as the Protective Order states, "The burden of

proving that a Protected Document contains confidential information is on the party claiming such protection (the 'Producing Party')". (Dkt. #52 at ¶ 3.) If the Plaintiff disagrees with the confidential designation of *any document*, she can notify the Defendant, and the Court will set a hearing for the purpose of establishing whether the disputed document is confidential. (*Id.* at ¶ 5.) Thus, if Plaintiff doubts whether a particular document contains trade secret, confidential, or otherwise protectible information, she is entitled challenge the designation and the Defendant will have the burden to prove the document should be protected.

In addition, although Plaintiff claims that the sharing provision is necessary to protect the safety of the public, the Protective Order as entered contains a specific provision allowing the Plaintiff to provide to the National Highway Traffic Safety Administration ("NHTSA") any "Confidential Information" produced in this matter that the Plaintiff deems relevant to motor vehicle safety. (*Id.* at ¶ 19.) So, if there is a "smoking gun" document that Plaintiff's counsel discovers and believes will avoid another calamity such as the GM Ignition Switch debacle, Plaintiff's counsel is entitled to send it along to the NHTSA post haste (after notice to the Defendants), thereby protecting the public interest. Sending it to some unidentified group of other lawyers seems a much less direct and effective way of achieving that public safety goal.

Plaintiff cites a number of legal decisions that approve sharing of produced confidential documents among plaintiffs' lawyers. But many of those cases involve an identifiable group of plaintiffs or their counsel and a large number of nearly identical existing cases. Many of those cases also involve a petition or intervention by that group of identifiable third-party lawyers or collateral plaintiffs—not a pro-active effort by a

8

single plaintiff to get advance permission to share confidential documents with unknown lawyers in yet-to-be filed cases. By example, Plaintiff points specifically to *Ward v. Ford*, 93 F.R.D. 579 (D. Colo. 1982), as the kind of case where the court approved the sharing of discovery information among lawyers in similar cases. But in that instance, which involved the rear-ending of a 1971 Mercury Montego and the deaths of three passengers from the resulting gasoline fire, there were several hundred extant cases involving Ford's fuel system integrity. In that situation, more than fifty lawyers representing plaintiffs in the many cases had organized themselves into an organization called the "Attorneys Information Exchange Group," which then filed an amicus brief and participated in oral argument on the discovery issue in that case. Here, there is no similar Information Exchange Group and no other similar cases have been identified to the Court.

Another case cited by Plaintiff, *Wilk v. American Medical Ass'n*, 635 F.2d 1295 (7th Cir. 1980), involved one of a series of antitrust lawsuits filed by chiropractors against the American Medical Association in Illinois. The State of New York had filed a similar suit in the Eastern District of New York and then intervened in the Illinois lawsuit seeking access to the Illinois federal court discovery. The lawsuits were not identical, but the "operative charges of wrongdoing in the two complaints [were] almost word for word the same." In that case, the third-party seeking access to the protected discovery was identifiable, and the allegations underlying the two lawsuits were very similar. The Seventh Circuit, finding that New York was a "bona fide litigant who needs access for bona fide litigation purposes" approved modification of the protective order to allow access by New York State. In this case, by contrast, there is no intervenor with an

9

identifiable interest and no ability of this Court to determine whether any recipient would use the information for bona fide litigation purposes.

Plaintiff apparently wants to provide these documents to any future lawyer in any future case that might be filed against GM or TRW. It is not clear why Plaintiff is fighting hypothetical future discovery battles for hypothetical future plaintiffs. Plaintiff has provided no evidence of the number of rollover accident deaths involving Chevy Impalas allegedly caused by the lack of ESC, allegedly defective seatbelts, or inadequately designed windows. There is no evidence before the Court that there are a multitude of similar cases across the country involving the same technology or design. And, if there were, the plaintiffs in those cases could come to this Court and seek access to the discovery documents and the Court would assess their bona fides at that time. Like Judge Wang in her well-reasoned decision in *Bell v. Liberty Mut. Fire Ins. Co.*, 15-cv-2788-WJM-NYW (D. Colo. Mar. 28, 2016), "[t]his court declines to supplant any future court's consideration of whether discovery is proper under Rule 26(b)(1) (or other applicable state rule of civil procedure) with its own judgment that is more properly applied to the fact presented in this case."

For the reasons stated, Plaintiff's Motion to Revise the Protective Order (Dkt. #57) is **DENIED**.

Date: June 4, 2019

*N. Reid Neureiter*

N. Reid Neureiter
United States Magistrate Judge

10